## Ronald E. FERGUSON

v.

## HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY and ITT Hartford Insurance Group

No. 2:99–CV–6578–TJS.

United States District Court, E.D. Pennsylvania.

May 23, 2003.

Ara Richard Avrigian, Larry Bendesky, Saltz Mongeluzzi Barrett & Bendesky, PC, Philadelphia, PA, Thomas F. Crawford,

Law Offices of Thomas F. Crawford and Associates, Langhorne, PA, David B. Winkler, Law offices of David B. Winkler, Cherry Hill, NJ, for Ronald E. Ferguson.

Jacqueline K. Gallagher, Barbara A. O'Connell, Swenney & Sheehan, Philadelphia, PA, for Hartford Life and Acc. Ins. Co.

## MEMORANDUM AND ORDER

SAVAGE, District Judge.

Ronald E. Ferguson brought this action against the defendants Hartford Life and Accident Insurance Company and ITT Hartford Insurance Group (collectively referred to as "Hartford") pursuant to the Employee Retirement Income Security Act of 1974. 29 U.S.C. § 1001, et seq. ("ERISA").[1] He asserts that Hartford wrongfully denied his claim for long term disability benefits under his insurance policy. Hartford retorts that the plaintiff is not entitled to benefits because he is not disabled within the terms of the disability policy and is still able to work.

Hartford has moved for summary judgment, contending that its decision was proper under the terms of the policy and after a full review of the claim. Hartford argues that the claims process was fair and designed to give the plaintiff every benefit of the doubt.

On February 19, 2003, the parties entered into a stipulation that Hartford's motion and Ferguson's response are to be considered as cross-motions for summary judgment.

Because we find that the process by which Hartford reached its decision was arbitrary and capricious, Ferguson's motion will be granted and judgment will be entered in favor of Ferguson.

## I. Background Facts

Ferguson started his employment at Occidental Chemical Corporation ("Occidental") as a Division Manager in April 1986. (R. 223).[2] In 1992, he was promoted to Human Resources Manager and relocated from Texas to Pennsylvania. *Id.* He resigned from Occidental on March 8, 1996, claiming he was unable to do his job (R. 69, 141–42).

Ferguson has a history of treatment for a sleep disorder. He began suffering sleepiness and fatigue in his mid–20s. In 1986, at age 36, when his condition worsened, he saw Dr. Brevard Haynes, a sleep specialist in Nashville, Tennessee, who diagnosed a sleep disorder and prescribed stimulants. (R. 224). At that time, Dr. Haynes predicted that Ferguson's condition would gradually deteriorate. *Id.*

In 1991, Ferguson came under the care of Dr. Ismet Karacan, the Director of the Sleep Disorders Center at Baylor College of Medicine. (R. 76, 225). In April 1992, Dr. Karacan diagnosed Ferguson with central nervous system idiopathic hypersomnia, a sleep disorder, and prescribed stimulant treatment. (R. 76). After his transfer to Pennsylvania, Ferguson continued treatment with Dr. Calvin Stafford of the Sleep Disorders Center at Crozer Chester Medical Center. (R. 76).

As the effectiveness of the stimulant therapy decreased, Ferguson's condition deteriorated. (R. 144–45). Dr. Stafford prescribed several different stimulants to combat Ferguson's increased tolerance to his medication and his worsening symptoms. *Id.* In February 1996, Dr. Stafford

---

1. On September 11, 2002, this case was reassigned from the calendar of the Honorable Petrese B. Tucker.

2. The administrative record ("R.") is attached as an exhibit to Hartford's motion for summary judgment.

reported that as Ferguson's condition continued to decline, he was having increased problems with concentration and memory lapses. (R. 143). Though the stimulants alleviated the daytime drowsiness, they were ineffective for remediating Ferguson's cognitive impairments. *Id.*

In March 1996, Ferguson's sleep disorder had worsened to the point that he felt he was unable to perform his job duties. After consulting with Dr. Stafford, Ferguson resigned from his position as Human Resources Manager. (R. 142). In August 1996, Ferguson filed his disability claim with Hartford.

Hartford denied Ferguson's claim, advising him that he was "not totally disabled" as defined in the policy (R. 105).[3] Ferguson appealed the denial. Following the denial of the appeal, he filed this action.

## II. The Policy

On October 1, 1995, Ferguson became insured under a long term disability policy issued by Hartford. The policy provides benefits for accidental bodily injury, sickness, mental illness, substance abuse or pregnancy, which prevents an insured from performing the essential duties of his occupation during the first 24 months of the total disability. After the initial two year period, an insured must be prevented from performing the essential duties of any occupation for which he is qualified by education, training, or experience. (R. 319).

The policy gives Hartford the discretionary authority to "determine eligibility for benefits and to construe and interpret all terms and provisions" in the policy. (R. 336).

## III. ERISA Standard of Review

 The denial of benefits under an ERISA qualified plan must be reviewed using a deferential standard. Where the administrator of the plan has discretion to interpret the plan and to decide whether benefits are payable, the fiduciary's exercise of discretion is judged by an arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). A court is not free to substitute its judgment for that of the administrator. *Abnathya v. Hoffmann–La Roche, Inc.*, 2 F.3d 40, 41 (3d Cir.1993). Accordingly, deferring to the plan administrator, a court will not reverse the administrator's decision unless it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id.* at 45.

 Where the evidence raises a question of the plan administrator's impartiality or there is an inherent conflict of interest, a heightened standard of review is demanded. *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 442 (3d Cir.2001). A conflict of interest arises when an insurance company both funds and administers a disability plan. *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 387 (3d Cir.2000). Where there is a conflict requiring a heightened standard of review, a court must use a sliding-scale approach, giving less deference to the administrator's decision as the level of the conflict rises. *Id.* at 391–92.

Here, Hartford both funded and administered the plan, requiring application of the *Pinto* heightened review standard. Being "deferential, but not absolutely deferential," we shall consider whether Hartford's decision is supported by reason and examine the process by which it was

---

**3.** In the administrative record, page numbers 104–105 are repeated twice. The citations to pages 104–105 in this memorandum refer to the "first" 104–105.

reached. *Pinto*, 214 F.3d at 393. Thus, our inquiry focuses on whether the insurance company was arbitrary and capricious in its interpretation of the plan's eligibility requirements and its application of the facts presented.

### IV. Evidence Available to Hartford

In support of his claim, Ferguson submitted two reports of Dr. Karacan and Dr. Stafford's medical reports spanning five years of treating Ferguson.[4] Dr. Karacan originally diagnosed Ferguson with idiopathic hypersomnia based on two sleep studies he conducted. Dr. Stafford confirmed that diagnosis after Ferguson moved to Pennsylvania.

Upon reviewing Ferguson's disability claim, Hartford ordered three medical examinations. On June 25, 1996, Ferguson underwent a neurological examination by Dr. David Bucholz who concluded that there was insufficient reliable medical evidence to support a diagnosis of idiopathic hypersomnia. (R. 223, 228). He opined that the cause of Ferguson's symptoms was his chronic dependence on amphetamines and stimulants, and associated psychological and emotional factors. *Id.*

On October 24, 1996, J. Daniel Ragland, Ph.D. and A. Rand Coleman, Ph.D performed a neuropsychological consultation. They opined that Ferguson had a lifelong learning disability coupled with chronic fatigue which resulted in attention, concentration and memory deficiencies. (R. 280). The study also confirmed that mild depression exacerbated his symptoms. *Id.*

The following day, Dr. Christian Kohler, M.D. performed a neuropsychiatric examination. (R. 282). Significantly, Dr. Kohler did not rule out a sleep disorder. (R. 285). He advised Hartford that it was unclear whether Ferguson suffered from such a condition. (R. 283). At the same time, he concluded that many of Ferguson's cognitive and occupational impairments were consistent with a sleep disorder. *Id.*

Hartford denied Ferguson's disability claim on December 3, 1996, citing the records submitted by Ferguson and the three medical reports prepared by the reviewers it had hired. (R. 104–105). The reports of Ferguson's treating physician, Dr. Stafford, were dismissed as "not substantiated by the information we have reviewed." (R. 105). Dr. Karacan's reports were not mentioned. (R. 103).

After Ferguson appealed the denial, he submitted a letter from Dr. Stafford explaining his findings and rebutting some of those of Hartford's examiners. (R. 69, 76–78). Dr. Stafford stated that his and Dr. Karacan's findings "are objective evidence of a disorder of excessive sleepiness. (R. 76). The findings from the two multiple sleep latency tests robustly confirm the patient's claim of involuntary dozing and difficulty maintaining alertness." (R. 76–77).

During the appeal process, Hartford had Ferguson's records evaluated by a diplomate of the American Board of Sleep Disorders from The Medical Review Board of America. (R. 69). The reviewing physician believed that Ferguson's earliest diagnoses were no longer reliable because medical knowledge of sleep disorders had evolved during the seven years since the original testing. (R. 161). However, like Dr. Kohler, he did not rule out that Fergu-

---

4. In their motion for summary judgment, Hartford argues that Dr. Karacan's reports were never submitted for review, and information from Dr. Karacan had to be "gleaned from a review of Dr. Stafford's reports." (Mem. Law in Supp. of Def. Resp. to Pl. Opp. to Def. Mot. for Summ J. at 2). Yet, the physicians hired by Hartford received and discussed Dr. Karacan's reports. Hartford offers no explanation as to how they got them.

son had a sleep disorder, stating that "[Ferguson] may have a sleep disorder (i.e. idiopathic hypersomnia) which has responded poorly to central nervous system stimulants." *Id.* Finding it "a very complicated case," he recommended testing as a prerequisite to a final disability determination. *Id.*

Also available to Hartford on appeal was the report of Dr. Vijay Singh, an independent physician employed by the Pennsylvania Bureau of Disability who had evaluated Ferguson's medical condition in connection with his claim for disability benefits under Social Security. (R. 69). Dr. Singh determined that Ferguson suffered from a sleep disorder accompanied by a gradual cognitive decline which left him unable to continue working as a human resources manager. (Report of Dr. Singh at 3, *found at* Pl. Resp. in Opp. to Mot. Summ. J. at Ex. D).

On April 16, 1998, Hartford denied the appeal. Hartford concluded that Ferguson was still physically able to perform his occupation and had left Occidental due to his poor work performance.

## V. Hartford's Consideration of the Evidence

■ Significant procedural anomalies in this case warrant application of the heightened abuse of discretion standard. The record reveals that Hartford selected and relied on those portions of the record which supported denial of the claim while ignoring those parts which sustained Ferguson's position; it dismissed or gave little weight to the findings and opinions of Ferguson's treating physicians and his experts; and, it ignored its own experts' requests for additional testing which they deemed necessary to reach a final decision regarding Ferguson's disability.

## A. Non–Treating Physicians vs. Treating Physicians

Hartford was confronted with evaluating the opinions of numerous physicians, some of whom had treated Ferguson and others who had examined him or reviewed medical records at Hartford's request. It chose to accept the opinions of the doctors it had hired and preferred over those of Ferguson's doctors.

■ The treating physician rule requires that the opinions of a treating physician who is in a unique position to assess his patient's health as a result of having treated him over time are "entitled to substantial and at times controlling weight." *Skretvedt v. E.I. DuPont de Nemours & Co.,* 268 F.3d 167, 184 (3d Cir.2001) (quoting *Fargnoli v. Massanari,* 247 F.3d 34, 43 (3d Cir.2001)) This standard, which is used in reviewing social security disability claims, has been adopted for review of ERISA claims. *Id.*

It is obvious Hartford did not give any weight, let alone substantial or controlling weight, to Dr. Stafford's or Dr. Karacan's findings and conclusions. Otherwise, it would have explained the basis for its choosing its own doctors' opinions and would have addressed Dr. Stafford's rebuttal to the reports of the Hartford doctors.

In its original determination that Ferguson was not disabled from performing his job, Hartford relied on the reports of three doctors who had examined Ferguson for Hartford. (R. 71, 105). None of the doctors were experts in sleep disorders and none had treated Ferguson.

Hartford's rejection of Dr. Stafford's opinions was not accompanied by a satisfactory explanation. Dr. Stafford submitted lengthy records supporting his conclusion that there was objective evidence of Ferguson's disability and his inability to work. Not only did Hartford afford less

deference to the reports of Ferguson's treating physician than those of the non-treating physicians, Hartford glossed over them, simply stating that they were not substantiated. (R. 105).

Dr. Stafford described Ferguson's deteriorating condition in numerous letters to his patient's family physician, Dr. Dreazen, which were supplied to Hartford. Dr. Stafford's reports integrated the earlier reports of Ferguson's previous treating physician, Dr. Karacan. (R. 141–156). Discussing the debilitating effect of Ferguson's condition, Dr. Stafford wrote:

> [I]ncreasingly difficult to arise in the morning, and his punctuality has deteriorated. His concentration is reduced and his memory greatly impaired by the narcolepsy. These two make the performance of the tasks of his job all but impossible.... It is regrettable that this man's response to medication has deteriorated to the point where he can no longer perform at the high levels required by his career.

(R. 142).

In November 1995, Dr. Stafford found that Ferguson was suffering from excessive daytime sleepiness, a feeling of fatigue, and reduced productivity. (R. 144). Ferguson felt increased stress at work due to the decrease in his work output and the effect his illness was having on his overall work performance. *Id.* Dr. Stafford warned that stimulant treatments lose effectiveness after prolonged use. *Id.* In February 1996, Ferguson's condition worsened as he was experiencing increased difficulty with concentration, memory lapses, loss of train of thought and reduced energy. (R. 143). Dr. Stafford's report notes that Ferguson had a growing concern that he would be unable to fulfill his job tasks as his symptoms continued to grow in severity. *Id.* Finally, in March 1996, Ferguson complained to Dr. Stafford that the stimulant therapy was no longer effective and he was having difficulty rising in the morning. (R. 142). His failing memory, concentration lapses and sporadic bouts of falling asleep during the day made performance of his job responsibilities impossible. *Id.* Dr. Stafford concluded that Ferguson could no longer work at his job. *Id.*

On appeal Ferguson submitted Dr. Stafford's letter refuting some of the issues raised by Hartford's examiners. In the letter, Dr. Stafford emphatically stated:

> [Ferguson] clearly has a sleep disorder.... [he] deteriorated during the period of my treatment. His sleepiness became more problematic and refractory to stimulant medication. This finding is not surprising as many patients with disorders of excessive somnolence will find stimulants only partially effective and even this effectiveness will change over time.

(R. 77).

Dr. Stafford pointed out that Dr. Bucholz had failed to address the sleep latency data, resulting in conclusions that were at variance with diagnoses made in Texas. (R. 77). Dr. Stafford concluded that Hartford's reliance on Dr. Kohler's conditional report was misplaced because although Dr. Kohler did not completely concur with the sleep test findings, he did agree that a sleep disorder would explain Ferguson's problems and symptoms. *Id.* He added that Dr. Kohler's report actually "endors[es] our treatment and diagnosis and further supports the fact that these are disabling to my patient." *Id.* In addressing the report of Drs. Raglan and Coleman, Dr. Stafford found their conclusions deficient because they did not address Ferguson's excessive sleepiness or the results of his sleep studies. *Id.* In summary, Dr. Stafford challenged the reports relied upon by Hartford, remarking that the "clinical presentation and laboratory inves-

tigations do in fact support the diagnosis of idiopathic hypersomnia, and at this point it is my opinion that the patient is disabled and cannot continue his previous occupation as a human resources manager." *Id.*

Despite the substantial weight to be accorded a treating physician's opinion, Hartford tersely dismissed Dr. Stafford's reports in its original denial of benefits, stating that "even though [the reports] may conclude that you are unable to perform your occupation, [the reports] are not substantiated by the information we have reviewed." (R. 105). Hartford did not specifically identify the contradictory or insufficient "information" it had reviewed. On appeal, Hartford similarly afforded Dr. Stafford's opinion little consideration, concluding that the sleep studies which provided the baseline for his conclusions were outdated. (R. 71). Hartford did not address or acknowledge Dr. Stafford's rebuttal letter, leading us to conclude that it disregarded it.

Hartford similarly ignored the diagnoses and opinions of Ferguson's first sleep specialist, Dr. Karacan, who had been Ferguson's treating physician while Ferguson was living in Texas. (R. 76). After conducting two sleep studies, Dr. Karacan diagnosed Ferguson with a sleep disorder in 1992. *Id.* Hartford did not consider Dr. Karacan's findings and conclusions.

Paying little consideration to Ferguson's treating physicians, Hartford instead relied on the three doctors who each had examined Ferguson at its request and had no expertise in the sleep disorders field. The practice of relying on the opinion of a non-treating over that of a treating physician is discouraged and lowers the deference used in applying the abuse of discretion standard. *See, e.g., Skretvedt,* 268 F.3d at 167; *Regula v. Delta Family–Care Disability Survivorship Plan,* 266 F.3d

1130, 1147 (9th Cir.2001) (stating "in light of the Plan's apparent conflict of interest, the administrator's decision to reject the opinions of the appellant's treating physicians constitutes material, probative evidence of a conflict."). *See also Edgerton v. CNA Ins. Co.,* 215 F.Supp.2d 541, 551 (E.D.Pa.2002); *Holzschuh v. UNUM Life Ins. Co. of Am.,* 2002 WL 1609983, at *7 (E.D.Pa. Jul.18, 2002); *Cohen,* 155 F.Supp.2d at 352. The deference can only be lower and the likelihood of bias higher where the opinion of a non-specialist is chosen over a treating specialist.

### B. Selectivity

Hartford's selectivity of what medical evidence it accepted and what it rejected invites a closer scrutiny of the decision making process. An anomaly occurs where the administrator relies on part of the advice in a medical report while discarding other findings in it. *Pinto,* 214 F.3d at 394 (citing *Salley v. E.I. DuPont de Nemours & Co.,* 966 F.2d 1011, 1015 (5th Cir.1992)). When an administrator treats the same authority inconsistently, the sliding-scale review is "ratcheted upward by these suspicious events." *Pinto,* 214 F.3d at 394. It is especially pertinent where virtually every authority relied upon by Hartford was treated in this fashion.

Dr. Bucholz initially reviewed Ferguson's medical records and, without examining him, issued an opinion on May 14, 1996. (R. 214–15). He did examine Ferguson on June 25, 1996, and issued a lengthier report on July 2, 1996. (R. 223). Without altering his original opinion, Dr. Bucholz found insufficient evidence to diagnose a sleep disorder. At the same time, he conceded that Ferguson's complaints are legitimate and could result from his use of stimulants. (R. 228).

Hartford highlighted Dr. Bucholz's belief that there was inadequate evidence to

support a diagnosis that Ferguson suffered from a sleep disorder only. (R. 104). The denial failed to mention that Dr. Bucholz did not rule out that Ferguson actually suffers from such a disorder. (R. 214). Hartford misinterpreted the doctor's unwillingness to make a diagnosis of a sleep disorder as his ruling it out.

Hartford's selective reliance on parts of the neuropsychological consultation of Drs. Ragland and Coleman also raises doubt regarding its objectivity. Hartford cites the portion of the report stating there is no evidence of recent brain impairment or decreased cognitive potential. (R. 104). It ignores the parts discussing Ferguson's chronic fatigue, poor concentration, mild depression and difficulties with attention and memory. (R. 281).

On appeal, Dr. Singh's report was available to Hartford. (R. 69).[5] Hartford quoted the portion of Dr. Singh's report where he notes that Ferguson was having problems staying awake at work and often fell asleep at meetings. *Id.* The significance of this reference is that Hartford now takes the position that Ferguson's poor work performance was not due to his sleepiness, but because he lacked interpersonal skills and organization. (R. 69–71). What Hartford failed to mention is that Dr. Singh found that Ferguson suffered from a sleep disorder and was experiencing gradual cognitive decline. (Report of Dr. Singh at 3, *found at* Pl. Resp. in Opp. to Mot. Summ. J. at Ex. D). Dr. Singh concluded that Ferguson would be unable to continue to work as a human resources manager. *Id.*

Hartford's conclusions based on Dr. Kohler's report are the most troubling. Hartford references Dr. Kohler's observation that the sleep evaluations performed on Ferguson, both under Dr. Karacan and under the guidance of Dr. Stafford, are inadequate to support the diagnosis of narcolepsy. (R. 105). Hartford claims that Dr. Kohler concluded that Ferguson's symptoms were of insufficient severity to prevent him from performing his job. (R. 105). However, Dr. Kohler does not state these conclusions with the certainty Hartford claims he does. Instead, Dr. Kohler notes that "[f]rom a neuropsychiatric perspective it is *unclear whether [Ferguson] suffers from a sleep disorder, which, if present, would account for the depressive and probably state dependent subjective cognitive difficulties leading to decreased work performance.*" (R. 283) (emphasis added). Hartford ignored this significant caveat.

## C. Failure to Follow Recommendations of its Doctors

Compounding these anomalies is Hartford's taking its own doctors' opinions out of context and not following their recommendations. According to Hartford's physicians, a diagnosis would be speculative without further testing. Yet, Hartford did not order the studies and rested upon the reports of those who were admittedly unsure about their diagnoses.

More egregious than misquoting Dr. Kohler and taking his report out of context is Hartford's not ordering the testing which he determined was necessary before reaching a final diagnosis. (R. 285). Dr. Kohler was unsure what was causing Ferguson's symptoms. He informed Hartford:

> The prognosis of Mr. Ferguson is primarily dependent upon whether he suffers from primary idiopathic hypersom-

---

**5.** Dr. Singh examined Ferguson on behalf of the Pennsylvania Bureau of Disability as part of his Social Security benefits appeal.

nia or another sleep disorder. Sleep disorders are known to produce marked interference with a person's occupational, interpersonal and emotional functioning. As such the presence of a chronic sleep disorder will explain the occupational difficulties, subjective cognitive dysfunctional and low grade depressive symptoms.

(R. 284).

To resolve the diagnostic uncertainty, Dr. Kohler recommended independent sleep tests. (R. 285). He suggested the University of Pennsylvania's Sleep Center for the tests. *Id.* Hartford ignored Dr. Kohler's recommendation and refused to order the tests.

In his report, Dr. Kohler noted that the 1991–92 sleep studies demonstrate some abnormal sleep patterns but are insufficient to support a current diagnosis of narcolepsy. (R. 285). Hartford, without considering or addressing Dr. Kohler's request for definitive studies, claimed that the older sleep studies do not support the diagnosis of narcolepsy. Hartford simply took the reference out of context and failed to follow its own expert's recommendation of testing. (R. 105).

In evaluating Ferguson's appeal, Hartford submitted Ferguson's entire file to the Medical Review Institute of America. (R 160). This review was based solely on medical records. No doctor examined Ferguson. Nevertheless, Hartford relied significantly on the medical review.

Once again, Hartford failed to follow the recommendations of its own independent review. The reviewer, although suggesting that some of Dr. Stafford's findings were inconclusive, acknowledged that Ferguson may suffer from a sleep disorder which responded poorly to stimulant therapy. (R. 161). The reviewer plainly states that "[b]efore establishing whether [Ferguson] has a permanent disability, more recent testing that can reliably address the issues noted above *would be necessary.*" (R. 161) (emphasis added). Though the reviewer was unable to draw any conclusions without the necessary additional testing, no such testing was ever ordered or administered.

Hartford offers no explanation for its failure to have the testing done before it rendered a decision which ran counter to the professional opinions of Ferguson's treating physicians, one of whom was a specialist in the disorder, and which was required by its own physicians before they could definitively conclude that Ferguson was not disabled.

## VI. Conclusion

After carefully reviewing the administrative record in its entirety, we find that Hartford acted arbitrarily and capriciously in denying Ferguson's claim for benefits. Hartford disregarded objective medical evidence produced by Ferguson's treating physicians, and instead chose to rely selectively on parts of the opinions of non-treating physicians while ignoring those parts which did not support its position. Therefore, because Hartford acted arbitrarily and capriciously in considering Ferguson's claim and there is sufficient evidence to indicate that Ferguson suffers from a total disability as defined in the policy, judgment will be entered in favor of Ferguson.

An order follows.

### *ORDER*

AND NOW, this 23th day of May, 2003, upon consideration of the cross-motions for summary judgment (Document Nos. 12, 37), it is **ORDERED** as follows:

1) The defendants' motion for summary judgment is **DENIED**;

2) The plaintiff's motion for summary judgment is **GRANTED**. Judgment will be entered after the parties have complied with the following paragraph:

3) No later than June 20, 2003, the parties shall submit a proposed order awarding the plaintiff relief consistent with this Court's memorandum opinion accompanying this Order. If the parties cannot agree on a proposed order, they shall file separate proposed orders accompanied by explanations not to exceed three pages.