THOMAS W. THRASH, JR., United States District Judge
This is an ERISA action to recover benefits under a group long term disability plan. It is before the Court on the Plaintiff Arthur Lesser, IV's Motion for Judgment on the Administrative Record [Doc. 28] and the Defendant Reliance Standard Life Insurance Company's Motion for Summary Judgment [Doc. 29]. For the reasons set forth below, the Plaintiff's Motion for Judgment on the Administrative Record [Doc. 28] is GRANTED and the Defendant's Motion for Summary Judgment [Doc. 29] is DENIED.
I. Judgment on the Administrative Record
The Plaintiff has moved for judgment on the administrative record. The Defendant has moved for summary judgment. Both parties rely exclusively on the administrative record. "When a decision is based on the agreed-upon administrative record, judicial economy favors using findings of fact and conclusions of law, not Fed. R. Civ. P. 56, to avoid an unnecessary step that could result in two appeals rather than one."[1] Therefore, Federal Rule of Civil Procedure 52(a)(1) provides the appropriate legal vehicle for adjudicating this case. In conducting a trial by papers pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court must "find the facts specially and state its conclusion of law separately. The findings and conclusions may be stated on the record after the close of evidence or may appear in an opinion or a memorandum of decision filed by the *1362 court."[2] The Court's findings of fact and conclusions of law are set forth below.
II. Findings of Fact
A. Long Term Disability Plan
The Defendant Reliance Standard Life Insurance Company contracts with Plaintiff Arthur Lesser IV's former employer, Johnson Outdoors, Inc., to provide long term disability benefits to its employees.[3] The Defendant must pay monthly benefits under the Plan when it determines that the claimant:
(1) is "Totally Disabled" within the meaning of the Plan,
(2) is under the regular care of a physician,
(3) has completed a 180-day elimination period, and
(4) has submitted "satisfactory proof of Total Disability" within 90 days of the date of loss or as soon as reasonably possible.[4]
A claimant is "Totally Disabled" under the Plan when he is unable to "perform the material duties of his/her Regular Occupation."[5] A claimant's "Regular Occupation" is the one that he is "routinely performing when Total Disability begins."[6] The Defendant determines the material duties of the claimant's occupation by looking to how it is performed in the national economy.[7]
B. Claim History
The Plaintiff worked as a software engineer for Johnson Outdoors, Inc. from May 16, 2011 until February 12, 2016.[8] After his last day at work, the Plaintiff successfully filed for leave under the Family Medical Leave Act and overlapping short term disability.[9] Dr. Thomas DiFulco, the Plaintiff's long-time primary care provider, listed the Plaintiff's diagnoses as (1) severe daytime hypersomnolence, (2) memory loss, (3) obstructive sleep apnea, (4) male hypogonadism, (5) pituitary dysfunction, (6) hypothyroidism, (7) mild brain atrophy, and (8) multifactorial generalized fatigue.[10] He opined in a certification form attached to the application that the Plaintiff "should not work due to inability to stay awake and inability to perform mental functions [that the] job requires."[11]
On June 23, 2016, the Plaintiff applied for long term disability for the same set of disabling conditions.[12] In a statement attached to the application, Dr. DiFulco opined that the Plaintiff's symptoms had *1363 worsened over time, culminating in the Plaintiff's inability to work as of February 9, 2016. He stated that the Plaintiff could only occasionally perform physical job-related tasks over the course of an eight-hour work day and that he was moderately to extremely limited in his ability to perform cognitive tasks.[13] Dr. Gena Mastrogianakis, another of the Plaintiff's treating physicians, also submitted a statement corroborating the Plaintiff's diagnoses of "hypersomnolence" and "severe fatigue" and recommending that the Plaintiff remain out of work indefinitely while receiving treatment.[14]
The Defendant initially approved the Plaintiff's claim and paid the Plaintiff benefits from August 13, 2016 to October 13, 2016.[15] On September 8, 2016, a registered nurse identified in the administrative record as "A. Purtell" reviewed the Plaintiff's file and concluded that the medical records did not indicate what had "caused the impairment" on the date of loss.[16] The nurse reviewed the file again on November 11, 2016, and came to the same conclusion.[17] On January 27, 2017, a second registered nurse, Geiza R. Glean, reviewed recently received medical records and recommended follow up to obtain the results of the Plaintiff's neuropsychological testing and to determine whether the Plaintiff was receiving psychiatric treatment.[18] On February 9, 2017, a third registered nurse, Jane Sweeney, reviewed the latest medical records received from the Plaintiff, including the results of his neuropsychological testing, and concluded that the medical records did not substantiate the Plaintiff's reports of cognitive dysfunction.[19] In a letter dated February 21, 2017, the Defendant informed the Plaintiff that his benefits had been terminated retroactively as of October 13, 2016.[20] The Defendant adopted Ms. Sweeney's conclusions more or less verbatim:
Despite your report of continued hypersomnia, your extensive testing to date has been unrevealing as to an etiology and you remained opposed to using recommended medications. In addition, there is a report of continuing brain fog, however your Neuropsychological test is not suggestive of cognitive dysfunction. Although there is documentation of your high levels of anxiety which is controlled with current medications, there is no documentation of any ongoing mental health treatment. Based on the totality of information it remains unclear what changed at or near the date of loss.[21]
The Plaintiff appealed the Defendant's benefits decision on July 31, 2017.[22] The Plaintiff attached medical records from various specialists, as well as the results of a Functional Capacity Evaluation indicating that the Plaintiff was unable to perform the physical tasks associated with his job. In response, the Defendant arranged for the Plaintiff to undergo an independent medical examination with a neurologist, Dr. David Whitcomb.[23] The Defendant denied the Plaintiff's appeal in a letter dated *1364 November 20, 2017.[24] The Defendant relied primarily on Dr. Whitcomb's opinion that "[f]rom a purely physical standpoint, I believe [the Plaintiff] can work." The Defendant also relied on the opinion of its in-house vocational rehabilitation specialist, Carol S. Vroman, who reviewed Dr. Whitcomb's report and concluded that the Plaintiff could perform the material duties of a software engineer.[25] This appeal followed. The Plaintiff has exhausted his administrative remedies.
C. Medical History
The Plaintiff was diagnosed with obstructive sleep apnea in 2006 and began using a CPAP machine.[26] The Plaintiff reports that in 2008 he began experiencing renewed symptoms of fatigue and daytime sleepiness despite compliance with his CPAP regimen.[27] The Plaintiff claims that his symptoms worsened over the years despite efforts to treat them, and that in 2015 his symptoms had become so severe that he was unable to adequately perform his job.
The Plaintiff's principal diagnosis is hypersomnolence, or excessive daytime sleepiness.[28] The administrative record contains visit notes, test results, and other medical records from the Plaintiff's various providers. It is clear from these records that the Plaintiff is highly motivated to determine the etiology of his hypersomnolence, and as such has seen multiple specialists in fields ranging from cardiology to neurology. The Court will briefly summarize the treatment history of those providers that feature prominently in the administrative record and in the parties' briefing.
1. Dr. Thomas DiFulco, Internal Medicine
Dr. DiFulco has treated the Plaintiff since 2008. In late 2015, Dr. DiFulco ordered a battery of tests to pin down the source of the Plaintiff's fatigue, daytime sleepiness, and cognitive impairments. Blood tests conducted in October, November, and December of 2015 indicated that the Plaintiff had high cholesterol and low testosterone.[29] An MRI performed in January of 2016 revealed mild atrophy of the Plaintiff's frontal and parietal lobes.[30] In February and June of 2016, Dr. DiFulco submitted statements in support of the Plaintiff's short- and long-term disability claims, opining that the Plaintiff's hypersomnolence and various other diagnoses rendered the Plaintiff unable to work.[31] In June of 2016, Dr. DiFulco ordered a blood test to determine whether the Plaintiff had Lyme disease, which came back negative.[32] In September of 2016, Dr. DiFulco ordered further bloodwork that indicated that the Plaintiff's testosterone remained low.[33]
2. Dr. Alice Azzalin, Endocrinology
In February of 2016, Dr. DiFulco referred the Plaintiff to Dr. Alice Azzalin, an *1365 endocrinologist, for "evaluation and management of possible hypogonadism."[34] Dr. Azzalin ordered lab tests that confirmed that the Plaintiff has hypogonadism.[35] It is unclear from Dr. Azzalin's notes whether, in her view, the Plaintiff's hypogonadism contributed to the Plaintiff's fatigue or daytime sleepiness. It does not appear that the Plaintiff returned to Dr. Azzalin after she diagnosed the Plaintiff with hypogonadism.
3. Dr. Paul Zolty, Pulmonology
Also in February of 2016, Dr. DiFulco referred the Plaintiff to Dr. Paul Zolty, a pulmonologist, for an "expert opinion for the patient's hypersomnia/possible sleep apnea."[36] Dr. Zolty administered a sleep study, from which he surmised that there was "some evidence of subjective hypersomnolence" but "no evidence of objective hypersomnolence." Dr. Zolty noted that the Plaintiff never entered REM sleep during the sleep study, which lasted around five hours.[37] Dr. Zolty also opined that the Plaintiff's underlying anxiety "appears to be playing a major part in his clinical presentation."[38] He suggested that better treatment of the Plaintiff's anxiety through medication and therapy could improve his overall prognosis.[39]
4. Dr. Brian S. Krachman, Osteopathy
The Plaintiff saw Dr. Brian S. Krachman for a single visit on February 29, 2016.[40] Dr. Krachman recommended that the Plaintiff undergo an echocardiogram to determine whether his disordered sleep might be related to an underlying heart condition.[41]
5. Dr. Robert D. Hoff, Cardiology
Dr. Krachman referred the Plaintiff to Dr. Robert D. Hoff, a cardiologist, for an echocardiogram.[42] The echocardiogram was performed on March 23, 2016, and revealed no heart issues that might explain the Plaintiff's disordered sleep.[43] It does not appear that the Plaintiff returned to Dr. Hoff or Dr. Krachman after undergoing the echocardiogram.
6. Dr. Gena Mastrogianakis, Family Medicine
The Plaintiff saw Dr. Gena Mastrogianakis regularly from March of 2016 onward during the pendency of his claim. Dr. Mastrogianakis administered a treatment plan that involved dietary changes, nutrition supplements, and various holistic treatments like chiropracty, biofeedback, and detoxification. On June 22, 2016, Dr. Mastrogianakis submitted a statement as part of the Plaintiff's long-term disability claim opining that the Plaintiff's "hypersomnolence" and "severe fatigue" rendered him unable to work.[44] On October 3, 2016, Dr. Mastrogianakis wrote in a visit note that the Plaintiff's sleep was "ok" and that his insomnia was "ok sleeping too much."[45] On May 25, 2017, Dr. Mastrogianakis *1366 completed a Treating Physician Questionnaire as part of the Plaintiff's Functional Capacity Evaluation in which she opined that its findings were consistent with her own assessment of the Plaintiff's condition.[46]
7. Dr. David Rye, Sleep Medicine
Dr. DiFulco referred the Plaintiff to Dr. Rye, an expert in sleep medicine, to be evaluated for his hypersomnolence and brain fog. The Plaintiff saw Dr. Rye on several occasions from March of 2016 through January of 2017. In his initial consultation with the Plaintiff, Dr. Rye administered a psychomotor vigilance test and noted "profound decrements in psychomotor vigilance."[47] Dr. Rye wrote that he suspected that the Plaintiff's hypersomnolence and brain fog arose from "potentially long term detrimental effects of untreated [obstructive sleep apnea ] as etiology."[48] Dr. Rye ordered a week long wrist actigraphy to record the Plaintiff's sleep patterns. After receiving the results of the study, Dr. Rye noted that "[t]he wrist actigraph notes A LOT of time in bed - 12 on average and only 8:45 in sleep - in reviewing his coincident diary (including naps - seemingly picked up on actigraphy algorithm) which are long > 1 hour on several days for several events)."[49] Based in part on the results of the wrist actigraphy, Dr. Rye confirmed the Plaintiff's hypersomnolence diagnosis. Dr. Rye recommended that the Plaintiff undergo empiric trials of various wakefulness-inducing medications but noted that the Plaintiff was reluctant to do so due to prior bad experiences with medications.[50]
Dr. Rye ordered various tests to rule out potential causes of the Plaintiff's hypersomnolence. Dr. Rye referred the Plaintiff for an electroencephalogram to determine whether the Plaintiff's disordered sleep was caused by epilepsy or seizures.[51] The test was performed on April 11, 2016, and came back negative. On October 24, 2016, Dr. Rye performed a lumbar puncture on the Plaintiff to test for narcolepsy.[52] The Plaintiff's hypocretin levels were normal, ruling out a diagnosis of narcolepsy.[53] In Dr. Rye's final visit note with the Plaintiff, recorded on January 27, 2017, Dr. Rye wrote of the Plaintiff's fatigue that "much could be related to his heightened level of arousal/anxiety that remains despite low-dose anxiolytics and venlafaxine."[54] On May 31, 2017, Dr. Rye completed a Treating Physician Questionnaire as part of the Plaintiff's Functional Capacity Evaluation in which he opined that the findings of the Functional Capacity Evaluation were consistent with his own evaluation of the Plaintiff's condition.[55]
8. Dr. David W. Loring, Neurology
Dr. Rye referred the Plaintiff to Dr. David W. Loring, a neurologist, for a neuropsychological evaluation. Dr. Loring conducted the evaluation on December 13, 2016. After having the Plaintiff complete a series of cognitive tasks, Dr. Loring placed the Plaintiff in the 55th percentile for overall IQ, the 82nd percentile for verbal comprehension, the 34th percentile for perceptual *1367 reasoning, the 55th percentile for working memory, the 34th percentile for processing speed, and the 61st percentile for general ability.[56] Dr. Loring summarized his impressions as follows:
1. This is a largely normal neuropsychological evaluation including normal verbal memory and normal working memory, although there is some suggestion of mild executive function inefficiency as seen in his visual constructional tasks, word retrieval inefficiency during naming, and memory retrieval inefficiency for geometric designs. It is also likely that poorer Perceptual Reasoning compared to Verbal Comprehension reflects a mild executive function component associated with novel problem solving.
2. Significant concerns regarding physical function and health, as well as high levels of anxiety and tension with frequent rumination are present.[57]
Dr. Loring noted the Plaintiff's high degree of concern about his health but concluded that there was no evidence of somatization.[58]
9. Kirk Bowers, Physical Therapy
The Plaintiff underwent a Functional Capacity Evaluation at Atlanta Sport & Spine Physical Therapy on April 20, 2017.[59] Kirk Bowers, the doctor of physical therapy conducting the Functional Capacity Evaluation, determined that the Plaintiff gave full effort during the evaluation.[60] Bowers administered a two-day test of the Plaintiff's range of motion, material and non-material handling capabilities, and psychometrics. Bowers also administered a job-specific test involving fifteen minutes of continuous typing, during which the Plaintiff exhibited objective evidence of fatigue. Bowers summarized his findings as follows:
During today's examination, [the Plaintiff] displayed limited ability to perform repetitive tasks and material handling. He had sharp heart rate increases during many simple activities and required frequent rest breaks due to fatigue and mechanical breakdown to ensure his safety. It was determined that [the Plaintiff] will be unable to tolerate an eight-hour workday and must remain in control of his work pace at all times, and not be forced to meet deadlines. Working in even a Sedentary job will lead to cumulative exhaustion and missed workdays that will make it difficult for him to effectively produce for an employer. Further, his need to alter his body positions between sitting, standing, and laying supine will limit his employment opportunities. [The Plaintiff] must adhere to the recommendations made in this report in order to be an effective producer in life and avoid further complications.[61]
As previously noted, Dr. Mastrogianakis and Dr. Rye signed questionnaires attached to the Functional Capacity Evaluation indicating that, in their view, the results of the Functional Capacity Evaluation comported with their own observations of the Plaintiff's condition.
10. Dr. David Whitcomb, Neurology
After receiving the Plaintiff's appeal, the Defendant arranged for the Plaintiff to see *1368 neurologist Dr. David Whitcomb for an independent medical review on October 26, 2017.[62] Dr. Whitcomb completed a physical capacities questionnaire supplied by the Defendant on which he indicated that the Plaintiff could occasionally or frequently perform tasks associated with sedentary work.[63] Dr. Whitcomb determined that the Plaintiff's mental functioning was relatively intact, albeit somewhat slow.[64] Dr. Whitcomb stated that the Plaintiff's medical records largely substantiated his subjective claims of fatigue and hypersomnolence.[65] Dr. Whitcomb, however, apparently formed the opinion that the Plaintiff's reported symptoms are somatizations of his underlying anxiety and depression.[66] Dr. Whitcomb did not reveal the basis for this opinion in his report. Dr. Whitcomb opined that the Plaintiff could be returned to productivity with a change to his medication and more effective psychiatric treatment. "From a purely physical standpoint," Dr. Whitcomb wrote, "I believe he can work."[67] Dr. Whitcomb did state, however, that "[i]t may be that his former occupation of being a software engineer would be impossible to him[.]"[68]
III. Conclusions of Law
The Employee Retirement Income Security Act of 1974 allows claimants to challenge adverse benefits decisions in federal district court.[69] In reviewing the challenged denial, the district court proceeds essentially as an appellate court.[70] The court does not take evidence, but rather evaluates whether the denial was reasonable in light of the record compiled by the plan administrator.[71]
In an ERISA action challenging an adverse benefits decision, the burden is on the claimant to prove his entitlement to benefits.[72] The Plaintiff argues that the circumstances of this case require the Court to depart from this general rule. The Defendant in this case initially approved the Plaintiff's claim for benefits and paid the Plaintiff benefits from August 13, 2016, through October 13, 2016. The Defendant then reevaluated the Plaintiff's claim and determined that he was no longer disabled as of October 13, 2016. Relying on Levinson v. Reliance Standard Life Ins. Co. , the Plaintiff argues that a plan administrator that reverses its initial approval of a claim has the burden of proving that the reversal was justified by some substantial change in the claimant's condition.[73] That is not the case. In Levinson , the Eleventh Circuit affirmed a district court decision in which the district court, after finding that the plaintiff had furnished proof of an ongoing disability, shifted the burden to the defendant plan administrator to show that the plaintiff was no longer disabled. In Levinson, as in every other case arising under *1369 29 U.S.C. § 1132(a)(1)(B), the initial burden remained with the plaintiff to prove his entitlement to benefits. Other district courts in this circuit have considered and rejected the interpretation of Levinson that the Plaintiff urges here.[74] The Court therefore concludes that Levinson does not excuse the Plaintiff in this case from meeting his initial burden of proof.
Having dispensed with the Plaintiff's Levinson argument, the Court turns now to the six-part standard of review for ERISA benefits decisions established by the Eleventh Circuit. The Court will proceed as follows:
1. Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
2. If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
3. If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
4. If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
5. If there is no conflict, then end the inquiry and affirm the decision.
6. If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.[75]
The Defendant is vested with the discretion to review claims under the Plan.[76] Therefore, this Court begins by determining whether the Defendant's decision is de novo wrong. If it is, then the Court, must determine whether reasonable grounds nevertheless exist to support the Defendant's decision. The Plaintiff states that the Defendant has a structural conflict insofar as it decided claims for benefits and funded them. The Defendant does not disagree.
A. Whether the Defendant's Benefits Determination was De novo Wrong
At the first stage of the analysis, the Court must decide whether the plan administrator's benefits determination was "wrong."[77] The Court does so by conducting a de novo review of the administrative record to decide whether it disagrees with the administrator's determination. The Court must limit its review to those materials before the administrator when the *1370 determination was made.[78]
The Court begins with the Plan's eligibility requirements.[79] The Plan requires that claimants furnish "satisfactory proof of Total Disability" to the plan administrator.[80] The Plan defines "Total Disability" as the inability to "perform the material duties of [the claimant's] Regular Occupation."[81] The Plaintiff was employed as a software engineer when he filed for disability benefits.[82] During the administrative review process, the Defendant determined that the medical evidence in the record did not show that the Plaintiff met the Plan definition for total disability as of October 13, 2016.[83] It is this determination that the Court must review.
In determining whether the medical data support the Plaintiff's claim of total disability, it is necessary to review the job requirements of a software engineer. The Defendant's vocational rehabilitation specialist relied on the United States Department of Labor's Dictionary of Occupational Titles, which states that software engineers must "apply[ ] principles and techniques of computer science, engineering, and mathematical analysis" to the development and maintenance of software systems.[84] Tasks include analyzing software requirements; consulting with other engineering staff; formulating and designing software systems; developing and directing testing for software systems; and consulting with customers. Software engineers should have "General Learning Ability" and "Numerical Aptitude" scoring in the top ten percent of the population.[85] The physical demands of the job are light, but the cognitive demands are heavy.
The Plaintiff reports that he experiences bouts of daytime sleepiness and fatigue and must take one or more lengthy naps during the day. He reports that these bouts of sleepiness cause lapses in concentration and memory and that his symptoms worsen if he resists sleep. Dr. DiFulco opines that as a result the Plaintiff is extremely limited in his ability to follow instructions, to perform simple and repetitive tasks, and his ability to perform complex and varied tasks.[86] The Plaintiff's symptoms and resulting limitations would, if substantiated, clearly prevent him from performing the tasks associated with being a software engineer. Someone who experiences daily severe lapses in memory and concentration and is compelled to nap during the workday manifestly cannot achieve the high level of cognitive functioning that the job requires. The question therefore becomes whether the medical evidence corroborates the Plaintiff's reported symptoms and resulting limitations.
The Plaintiff has provided sufficient medical evidence to prove that his condition materially limits him from performing the duties of a software engineer. The Plaintiff's treating physicians-Dr. DiFulco, Dr. Mastrogianakis, and Dr. Rye-have *1371 consistently opined that the Plaintiff's hypersomnolence is ongoing and wholly disabling. While neither the Court nor the Defendant is required to give controlling weight to the opinions of the Plaintiff's treating physicians,[87] the Court can and does take into account the Plaintiff's longstanding relationship with these providers and their substantial agreement with one another regarding the Plaintiff's condition and concomitant limitations.
The Court is mindful of the fact that "a claimant's 'subjective complaints do not become objective simply because a doctor wrote them down.' "[88] The Plaintiff's treating physicians necessarily relied on the Plaintiff's subjective complaints of daytime sleepiness and fatigue in diagnosing him and in determining his limitations. In this case, however, the opinions of the Plaintiff's treating physicians are corroborated by objective medical evidence. During his initial consultation with the Plaintiff, Dr. Rye administered a psychomotor vigilance test that demonstrated "profound decrements in psychomotor vigilance."[89] The wrist actigraphy study ordered by Dr. Rye recorded multiple lengthy naps on multiple days over the course of a week, corroborating the Plaintiff's reports of severe daytime sleepiness.[90] The Plaintiff also underwent a Functional Capacity Evaluation, which is among the most effective means of objectively measuring an individual's functional limitations.[91] The test administrator, Kirk Bowers, indicated that the Plaintiff exhibited "full and consistent effort" during the evaluation based on subjective and objective criteria, including heart rate monitoring.[92] Bowers concluded that the Plaintiff could not perform even sedentary work due to rapid onset of fatigue while performing simple tasks like typing and sitting for prolonged periods.[93] Both Dr. Rye and Dr. Mastrogianakis endorsed the results of the Functional Capacity Evaluation, opining that it was consistent with their own observations of the Plaintiff during treatment.[94] The Court is persuaded by this medical evidence that the Plaintiff's hypersomnolence prevents him from working as a software engineer, a job that requires sustained alertness and high levels of cognitive functioning.
The record evidence cited by the Defendant does not persuade the Court otherwise. In its initial denial letter, the Defendant cited a neuropsychological evaluation conducted by Dr. David W. Loring. The summary accompanying the evaluation describes the test results as "largely normal" and notes that the Plaintiff exhibited "mild executive function inefficiency."[95] The Defendant cites the results of this evaluation as evidence that the Plaintiff's condition would not prevent him from performing the cognitive tasks required of a software *1372 engineer. Dr. Loring, however, was measuring the Plaintiff's neuropsychological capacities against those of the general population, not against those of other software engineers. Even a "mild" impairment to executive functioning could prevent someone from performing a cognitively demanding job. Dr. Loring's full report provides the Court and the Defendant with the context needed to assess whether the Plaintiff's "mild executive function inefficiency" could impact his ability to work as a software engineer. During the evaluation, the Plaintiff obtained an IQ score in the 55th percentile and a "General Ability Index" score in the 61th percentile.[96] His demographic-adjusted scores ranked in the 18th and 24th percentiles, respectively.[97] As noted by the Court, the Dictionary of Occupational Titles states that software engineers should have "general learning ability" and "numerical aptitude" above the 89th percentile.[98] Clearly, software engineers must exhibit cognitive abilities that are far above average. While Dr. Loring did not set out to measure the Plaintiff's job-related aptitudes, the Plaintiff's middling IQ and GAI scores suggest that the Plaintiff's cognitive abilities do not meet the minimum requirements set forth in the Dictionary of Occupational Titles. At minimum, the Court sees no reason why Dr. Loring's findings should weigh against the conclusions of the Plaintiff's treating physicians.
In its letter denying the Plaintiff's appeal, the Defendant cites the independent medical evaluation performed by Dr. David Whitcomb as evidence that the Plaintiff was not disabled as of October 13, 2016. The Court finds Dr. Whitcomb's evaluation to be unhelpful in answering the question of whether the Plaintiff can work as a software engineer. That is because Dr. Whitcomb expressly disclaims any opinion as to whether the Plaintiff can work in his previous occupation. In his remarks regarding the Plaintiff's prognosis, Dr. Whitcomb states that "[i]t may be that his former occupation of being a software engineer would be impossible to him, but I suspect that there are many other sorts of occupations that he could do."[99] A claimant is totally disabled under the Plan when he is unable to work at his "regular occupation." The Plaintiff's hypothetical ability to work at some other occupation has no bearing on whether he can perform the duties of a software engineer. Dr. Whitcomb's overall conclusion that "from a purely physical standpoint, I believe [the Plaintiff] can work" is similarly unhelpful because the job of a software engineer is not purely, or even primarily, physical. The Defendant asked Dr. Whitcomb, a neurologist, to complete a physical capacities questionnaire that contained no questions regarding the Plaintiff's cognitive abilities.[100] At most, Dr. Whitcomb's assessment serves as a counterpoint to the results of the Functional Capacity Evaluation. But there is no indication that Dr. Whitcomb reviewed the Functional Capacity Evaluation, which was conducted over two days and with the benefit of heartrate *1373 monitoring, before coming to a contrary conclusion after a thirty-five minute physical examination. Regardless, because Dr. Whitcomb is equivocal at best about the Plaintiff's ability to perform the duties of his "regular occupation," the Court accords his conclusions little weight in its de novo review of the Plaintiff's claim.
In filings submitted to the Court, the Defendant identifies other record evidence that it argues shows that the Plaintiff was not disabled as of October 13, 2016. The Defendant provides its own interpretation of a lumbar puncture test performed by Dr. Rye that revealed that the Plaintiff's hypocretin levels were normal.[101] Relying on a definition of the term "hypocretin" derived from a website, the Defendant concludes from these test results that "disability based on a sleep disorder is not objectively supported."[102] As the cited medical record makes clear, however, low hypocretin levels are indicative of narcolepsy, not hypersomnolence. The cover letter accompanying the results states that "[t]his test is separate from the test done to measure GABA receptor potentiation in idiopathic hypersomnia."[103] Dr. Rye did not conclude from the test results that the Plaintiff's hypersomnolence diagnosis was incorrect. The Defendant's interpretation of the test results is not supported by any medical evidence on the record.
The Defendant also highlights an October 3, 2016, visit note in which Dr. Mastrogianakis wrote that the Plaintiff was "doing ok," that his sleep was "ok," and that his insomnia was "ok sleeping too much."[104] Dr. Mastrogianakis's vague pronouncement that the Plaintiff was "doing ok" tells the Court little about the Plaintiff's condition at that time. "Doing ok" does not suggest improvement, and Dr. Mastrogianakis's statements submitted as part of the Plaintiff's claim make clear that she believed the Plaintiff to be totally disabled during the period in which this visit note was recorded. The Court sees no reason to accord this single, out of context visit note any great weight.
Finally, the Defendant points out that the Plaintiff demonstrates perfect CPAP according to data pulled from his CPAP device.[105] The Defendant concludes from this that the Plaintiff's sleep apnea cannot be disabling. The Defendant appears to be laboring under the misconception that sleep apnea, narcolepsy, and hypersomnolence are interchangeable medical conditions. They are not.[106] Neither the Plaintiff nor any of the Plaintiff's treating physicians have claimed that his symptoms of daytime sleepiness and fatigue are caused by the Plaintiff's well-controlled obstructive sleep apnea.[107]
*1374 Rather, the record details the Plaintiff's treating physicians' efforts to determine why the Plaintiff continued to experience symptoms of daytime sleepiness and fatigue despite the Plaintiff's compliance with his CPAP regimen. To point out that the Plaintiff's sleep apnea is well-controlled is simply to restate a fact that is not in dispute and does not undermine the Plaintiff's disability claim. After consideration of the record in its entirety, the Court concludes that the Plaintiff met the Plan definition for "Total Disability" as of October 13, 2016, and that the Defendant's decision to cease payment of benefits was de novo wrong.
B. Whether the Defendant's Benefits Determination was Arbitrary and Capricious
The Plan vests the Defendant as plan administrator with the discretion to make benefits determinations. Therefore, even though the Court has determined that the Defendant's decision was de novo wrong, it must nevertheless uphold the determination unless it was arbitrary and capricious.[108] "The standard for whether the determination was arbitrary and capricious is not the preponderance standard, but whether it was the product of a deliberate, principled reasoning process and supported by substantial evidence."[109] Substantial evidence need not amount to a preponderance but must be more than a scintilla.[110] After careful review of the reasons given in the Defendant's denial letters, the Court concludes that the Defendant's determination was arbitrary and capricious for three reasons: (1) the Defendant incorrectly applied Plan standards; (2) the Defendant arbitrarily weighed and selectively read medical records to support its decision; and (3) the Defendant arbitrarily ignored substantial, relevant evidence of disability supplied by the Plaintiff.
1. Misapplication of Plan Requirements
During the initial review process, the Defendant placed undue emphasis on the etiology of the Plaintiff's hypersomnolence. As the Defendant noted in its initial denial letter and as its nurses emphasized in their internal reviews, the etiology of the Plaintiff's hypersomnolence is unclear. The various tests performed by the Plaintiff's medical providers have ruled out various possibilities, like Lyme disease or a heart condition, but have not definitively ruled in any one physiological cause, like the Plaintiff's frontal lobe atrophy or hypogonadism. But the Plan requires satisfactory proof of disability, not etiology. A claimant establishes eligibility under the Plan terms by proving that he cannot perform the material duties of his regular occupation, not by identifying the root cause of his illness.[111] It is neither wrong nor unreasonable for a plan administrator to require objective medical evidence of disability, even where the plan documents *1375 do not specifically require it.[112] It is wrong and unreasonable, however, to require the claimant to furnish proof of the root cause of his illness when it is not one that is easily diagnosed by objective tests and where there is no evidence that the claimant is malingering.[113] It is clear from the numerous diagnostic tests conducted by the Plaintiff's medical providers that hypersomnolence is a condition with many possible physiological causes-or, in the case of idiopathic hypersomnolence, no clear root cause at all. Moreover, there is no evidence in the record to suggest that the Plaintiff was malingering. The Defendant's inappropriate focus on etiology was therefore arbitrary and capricious.
The record also suggests that the Defendant inappropriately applied the "Any Occupation" standard, rather than the "Regular Occupation" standard, to the Plaintiff's claim. Inexplicably, the opinion offered by the Defendant's in-house vocational rehabilitation specialist discusses only the physical requirements of a software engineer.[114] The specialist begins by listing the tasks associated with the job as set forth in the Dictionary of Occupational Titles. These include tasks that clearly require a high level of cognitive functioning, like designing software systems and interfacing with hardware engineers and clients. But the specialist proceeds to list only the physical demands of the occupation and concludes that the Plaintiff was able to work as a software engineer because Dr. Whitcomb found that the Plaintiff could perform sedentary work. In its letter denying the Plaintiff's appeal, the Defendant adopted the opinion of its vocational rehabilitation specialist as follows:
Based on the totality of the claim file, the IME, the physical capacities questionnaire and restrictions and limitations completed by Dr. Whitcomb, Mr. Lesser is capable of performing a sedentary exertion level occupation and as much as a light lift. As such, Mr. Lesser's file was referred to our Vocational Rehabilitation Specialist to determine if he was capable of performing the material duties of his Regular Occupation. Please note that Mr. Lesser's Regular Occupation is based on a typical work setting for any employer in the general economy and not his specific job with his current employer. With that being said, per the Department of Labor, Mr. Lesser would be capable of performing his Regular Occupation within the restrictions and limitations noted.[115]
As the Defendant here acknowledges, the Plan requires the Defendant to determine whether claimants are unable to perform the material duties of their "regular occupation."[116] The ability to engage in sedentary exertion is a necessary, but not sufficient, condition to performing the material duties of a software engineer. While evidence that the Plaintiff is capable of sedentary work could preclude him from claiming *1376 disability under the "Any Occupation" standard articulated in the Plan, it does not preclude the Plaintiff from claiming disability under the "Regular Occupation" standard because the job of a software engineer requires more than the ability to sit, walk, stand, and type. The Defendant's use of this improper standard was arbitrary and capricious.
2. Selective Reading and Unsupported Interpretations of Medical Evidence
Both during its initial review process and on appeal, the Defendant selectively read and misinterpreted the medical evidence in the record to support its position. Plan administrators generally may assign greater or lesser weight to certain records at their discretion.[117] But this discretion is not unfettered, and plan administrators are not free to rely on selective or self-serving interpretations of the medical evidence that are not supported by the record.[118] In its initial denial letter, the Defendant suggests that the Plaintiff's claim should be denied because he "remained opposed to using recommended medications."[119] The Defendant appears to have been referring to the Plaintiff's decision not to undergo empiric trials of certain wakefulness-promoting medications, as documented in Dr. Rye's treatment notes.[120] The Defendant likens this case to Turner v. American Airlines, Inc. , in which a claimant with sleep apnea "wantonly disregarded treatment" by failing to comply with his CPAP therapy.[121] The comparison is inapposite. Reluctance to undergo empiric trials hardly rises to the level of "wanton disregard" for treatment. Moreover, Dr. Rye describes the Plaintiff's reluctance as "reasonable" due to previous adverse reactions to similar medications,[122] and expresses concerns of his own that the trials might "aggravat[e]" the Plaintiff's anxiety.[123] The extent to which Dr. Rye viewed these trials as necessary to the Plaintiff's care is unclear from these records. The Defendant could have, but did not, seek clarification from Dr. Rye, and may not now impute an opinion on Dr. Rye that he did not express in his treatment notes.
The Defendant also relied in its initial denial letter on Dr. Loring's summary of the Plaintiff's neuropsychological testing, in which Dr. Loring described the Plaintiff's neuropsychological functioning as "largely normal" with "some suggestion of mild executive function inefficiency."[124] Despite having the full test results available *1377 to it, the Defendant made no effort to measure the Plaintiff's middling to poor performances on these tests with the cognitive demands of the job as set forth in the Dictionary of Occupational Titles. Dr. Loring himself offers no opinion on whether a person with the Plaintiff's neuropsychological profile could perform the job of a software engineer, and the Defendant did not attempt to solicit one. While reasonable minds may differ on whether the Plaintiff's test results support his claim, they certainly do not undermine it. The Defendant's use of these results to support its adverse benefits determination was wrong and unreasonable.
Finally, in its letter denying the Plaintiff's appeal, the Defendant relies exclusively on the report of its independent medical examiner Dr. Whitcomb. For reasons that the Court has already discussed at length, it was wrong and unreasonable to rely on Dr. Whitcomb's report when Dr. Whitcomb declined to offer an opinion on whether the Plaintiff could work as a software engineer and assessed the Plaintiff's functional capacities "from a purely physical standpoint." The Defendant's selective reading of these medical records calls its objectivity into question and gives reason to doubt its ability to provide a full and fair review of the Plaintiff's claim.[125]
3. Failure to Consider Evidence
The Defendant compounded its unreasonable decision to rely on Dr. Whitcomb's report with its refusal, which goes unexplained in the denial letter, to address the results of the Plaintiff's Functional Capacity Evaluation. A plan administrator may, as part of a reasoned decision-making process, choose whether to credit or not to credit evidence that is favorable to the claimant. But arbitrarily ignoring substantial evidence of disability is wrong and unreasonable.[126] In its briefing before this Court, the Defendant argues that it did not need to credit the results of the Functional Capacity Evaluation because it was conducted several months after October 13, 2016, which is when the Defendant determined that the Plaintiff was no longer disabled.[127] The Defendant argues that it was free to disregard the endorsements of the Plaintiff's treating physicians because they did not specifically state that the Plaintiff was subject to the limitations described in the Functional Capacity Evaluation on October 13, 2016.[128] This is not a reasonable basis for ignoring the results of the evaluation. The Plaintiff's physicians treated the Plaintiff before and after October 16, 2016. Their endorsements are clearly intended to communicate that the Plaintiff *1378 was subject to severe limitations throughout his course of treatment with them, a period of time encompassing October 13, 2016. The Court also notes that Dr. Whitcomb did not examine the Plaintiff until over a year after benefits were discontinued, and yet the Defendant nevertheless chose to credit Dr. Whitcomb's opinions as to the Plaintiff's capacity to work on October 13, 2016. It further appears that Dr. Whitcomb was never provided with the Functional Capacity Evaluation,[129] despite the fact that the Defendant tasked him with measuring the Plaintiff's physical capacities.[130] Failure to consider the results of the Functional Capacity Evaluation or even to submit it to its independent medical examiner for review was wrong and unreasonable. The Defendant's denial letters do not otherwise articulate a reasonable basis for its adverse benefits determination.[131] The Court therefore concludes that the denial of benefits was arbitrary and capricious.
C. The Remedy
Having determined that the Defendant's adverse benefits determination was arbitrary and capricious, the Court must decide the appropriate remedy. The Plaintiff requests that the Court order the Defendants to pay benefits retroactively from October 13, 2016, through the date of judgment, as well as prejudgment interest and attorney's fees.[132] The Court agrees with the Plaintiff that a benefits award through the date of judgment is the appropriate remedy in this case. In Levinson, *1379 the Eleventh Circuit explained that a remand for reconsideration "is the appropriate remedy when the plan administrator has not had an opportunity to consider evidence on an issue."[133] In this case, however, the record is complete and neither party has put forward evidence that was unavailable to the Defendant at the time that it made its benefits determination.[134] The Court notes that the Plan requires ongoing proof of disability and that the last medical record that the Plaintiff submitted to the Defendant was the Functional Capacity Evaluation conducted on April 20, 2017. But, as the Eleventh Circuit held in Billings v. UNUM Life Ins. Co. of America , "[i]t would be patently unfair to hold that an ERISA plaintiff has a continuing responsibility to update her former insurance company and the court on her disability during the pendency of her internal appeals and litigation, on the off chance that she might prevail in her lawsuit."[135] While there is no evidence in the record showing that the Plaintiff continues to suffer a disability, there is equally no evidence that his condition has improved since the Defendant arbitrarily and capriciously discontinued his benefits.[136] Therefore, the Court will order the Defendant to reinstate the Plaintiff's claim and to pay all benefits due through the date of entry of final judgment or 36 months from the date that monthly benefits became payable under the Plan, whichever is earlier.[137]
The Court will not enter final judgment at this time, however, because the Plaintiff has requested, but has not briefed, attorney's fees and prejudgment interest in this case. The Court may award either or both forms of relief at its discretion.[138] The Court will permit the Plaintiff to submit within fourteen (14) days of this Order a motion for prejudgment interest and attorney's fees. The motion should be accompanied by a proposed final judgment order detailing, in specific dollar amounts, the award that the Plaintiff believes that he is owed under the Plan. The Defendant may submit a response within fourteen (14) days of receipt of the Plaintiff's motion, and the Plaintiff may file a reply fourteen (14) days thereafter. None of the filings should exceed ten (10) pages in length. The Court cautions the parties that it will not revisit any liability issues or revisit its decision to award benefits through the date of entry of final judgment. The parties'
*1380 briefing should be focused on the appropriateness of awarding prejudgment interest and attorney's fees in this case and on any disputes arising from the parties' respective damages calculations.
IV. Conclusion
For the reasons set forth above, the Plaintiff's Motion for Judgment on the Administrative Record [Doc. 28] is GRANTED and the Defendant's Motion for Summary Judgment [Doc. 29] is DENIED. The Plaintiff has fourteen (14) days from the date of this Order to submit a motion for prejudgment interest and attorney's fees.
SO ORDERED, this 3 day of June, 2019.

McInvale v. Metropolitan Life Ins. Co. , CIV.A. 5:07-CV-459HL, 2009 WL 2589521, at *1 n.2 (M.D. Ga. Aug. 18, 2009) (citing Doyle v. Liberty Life Assur. Co. , 542 F.3d 1352, 1363 n.5 (11th Cir. 2008) ).

Fed. R. Civ. P. 52(a)(1).

AR 1.

AR 9, 20.

AR 12. After 36 months, the claimant is Totally Disabled only if he is unable to perform the material duties of any occupation, not just the one in which he was previously employed. Id.

AR 11.

Id.

AR 48.

AR 176-177 (Family Medical Leave Act application). The Court cannot locate the Plaintiff's complete short term disability application. Only Dr. DiFulco's accompanying certification form, signed on February 10, 2016, appears in the record. AR 185-188. This omission is likely due to the fact that the Plaintiff's short term disability claim was processed by a third party administrator, identified in the record as Matrix Absence Management, rather than by the Defendant directly. Neither party disputes the award of short term disability benefits to the Plaintiff, so the absence of the Plaintiff's initial application is not material.

AR 186.

AR 188.

AR 162-175.

AR 213-216.

AR 217.

AR 133.

AR 60.

AR 61.

AR 62.

AR 63.

AR 125-127.

AR 63, 126.

AR 742-746.

AR 1198-1206.

AR 132-137.

AR 1209-1210.

AR 751.

Id.

The Plaintiff's medical providers alternately refer to the Plaintiff's condition as "hypersomnia" and "hypersomnolence." The terms appear to refer to the same clinical diagnosis. See Hypersomnolence, Dorland's Illustrated Medical Dictionary (32nd ed. 2012) (defining "hypersomnolence" by referring the reader to the entry for "hypersomnia").

AR 862, 592.

AR 153.

AR 174-175, 185-188.

AR 590.

AR 583.

AR 517.

AR 510. Hypogonadism is "a condition resulting from abnormally decreased gonadal function, with retardation of growth, sexual development, and secondary sex characters[.]" Hypogonadism , Dorland's Illustrated Medical Dictionary (32nd ed. 2012).

AR 426.

AR 439.

AR 442-443.

AR 443.

AR 485-489.

AR 489.

AR 530.

AR 634-638.

AR 217.

AR 500.

AR 760.

AR 245.

AR 246.

AR 372 (emphasis and punctuation in original).

AR 373.

AR 642-643.

AR 382.

AR 599.

AR 1032-1033.

AR 759.

AR 941.

AR 939.

AR 940.

AR 747-760

AR 747.

AR 748 (emphasis in original).

AR 1199-1206.

AR 1199-1200.

AR 1203.

AR 1204.

AR 1206.

Id.

AR 1205.

29 U.S.C. § 1132(a)(1)(B).

See Howard v. Hartford Life & Acc. Ins. Co. , 929 F. Supp. 2d 1264, 1286 (M.D. Fla. 2013) (citing Curran v. Kemper Nat. Servs., Inc. , No. 04-14097, 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005) ), aff'd , 563 F. App'x 658 (11th Cir. 2014).

Id.

Wangenstein v. Equifax, Inc. , 191 F. App'x 905, 911 (11th Cir. 2006).

245 F.3d 1321, 1331 (11th Cir. 2001).

See Hufford v. Harris Corp. , 322 F. Supp. 2d 1345, 1360 (M.D. Fla. 2004) ; Grant v. Provident Life And Accident Ins. Co. , 99-1329-CIV-MOORE, 2001 WL 1671028, at *6 (S.D. Fla. June 27, 2001).

Blankenship v. Metro. Life Ins. Co. , 644 F.3d 1350, 1355 (11th Cir. 2011).

AR 16.

Glazer v. Reliance Standard Life Ins. Co. , 524 F.3d 1241, 1246 (11th Cir. 2008) (citing Tippitt v. Reliance Standard Life Ins. Co. , 457 F.3d 1227, 1232 (11th Cir. 2006) ).

Id. (citing Jett v. Blue Cross & Blue Shield of Alabama, Inc. , 890 F.2d 1137, 1139 (11th Cir. 1989) ).

See Brannon v. BellSouth Telecomms. Inc. , 318 Fed. Appx. 767, 769 (11th Cir. 2009) ("In our de novo review, we turn first to the plan itself.") (citing 29 U.S.C. § 1104(a)(1)(D) ).

AR 20.

AR 12.

AR 48.

AR 125-127; 132-137.

AR 1209-1210; see also DOT 030.062-010 Software Engineer, 1991 WL 646541.

See DOT 030.062-010 Software Engineer, 1991 WL 646541.

AR 175.

Black & Decker Disability Plan v. Nord , 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003).

Howard , 929 F. Supp. 2d at 1294-95 (quoting Cusumano v. Continental Cas. Co. , 2008 WL 1711405, at *7 (M.D. Fla. Apr. 10, 2008) ), aff'd , 563 F. App'x 658 (11th Cir. 2014).

AR 245.

AR 372.

See Lake v. Hartford Life & Acc. Ins. Co. , 320 F. Supp. 2d 1240, 1249 (M.D. Fla.), aff'd sub nom. Lake v. Hartford Life & Accident , 126 F. App'x 463 (11th Cir. 2004) ; see also Fick v. Metro. Life Ins. Co. , 347 F. Supp. 2d 1271, 1280 (S.D. Fla. 2004) ; Madison v. Greater Georgia Life Ins. Co. , 225 F. Supp. 3d 1381, 1395 (N.D. Ga. 2016).

AR 747.

AR 748.

AR 759-760.

AR 939.

AR 941.

Id.

See DOT 030.062-010 Software Engineer, 1991 WL 646541.

AR 1205.

AR 1199-1200. The "physical examination" portion of Dr. Whitcomb's report documents some testing of the Plaintiff's memory and concentration. AR 1203. Again, Dr. Whitcomb seems equivocal about the Plaintiff's cognitive abilities, suggesting that the Plaintiff's short-term recall was in the "normal adult range" but also noting that the Plaintiff's concentration "is somewhat labored and slow[.]"

AR 599.

Def.'s Resp. to Pl.'s Mot. for J. on the Admin. Rec., at 13 (citing hypocretin , The Hypersomnia Foundation (August 25, 2017), available at https://www.hypersomniafoundation.org/glossary/hypocretin/ ).

AR 599.

AR 500.

See AR 764 (showing perfect CPAP compliance from January 25, 2017 to April 25, 2017).

It is clear from the record that these diagnoses are distinct from one another. Dr. DiFulco distinguished between hypersomnolence and sleep apnea in his attending physician statement and used distinct codes from the International Statistical Classification of Diseases to delineate them. AR 191. The cover letter of the Plaintiff's hypocretin test distinguishes between narcolepsy and hypersomnolence. AR 599.

Dr. Rye suggested in his initial visit note with the Plaintiff that years of untreated obstructive sleep apnea, prior to the Plaintiff's use of a CPAP machine, may have caused permanent degeneration contributing to the Plaintiff's hypersomnolence. AR 246.

Jett , 890 F.2d at 1140.

Reid v. Metro. Life Ins. Co. , 944 F. Supp. 2d 1279, 1316 (N.D. Ga. 2013) (citing Glenn v. MetLife, 461 F.3d 660, 666 (6th Cir. 2006), aff'd Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008) ).

Id. (citing McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 172 (6th Cir. 2003) ; Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995) ; Sandoval v. Aetna Life & Cas. Ins. Co. , 967 F.2d 377, 382 (10th Cir. 1992) ).

See AR 12 (defining "Total Disability" as the claimant's inability to "perform the material duties of his/her Regular Occupation[.]").

See Hufford , 322 F. Supp. 2d at 1356.

See Helms v. Gen. Dynamics Corp. , 222 F. App'x 821, 829 (11th Cir. 2007) (citing Mitchell v. Eastman Kodak Co. , 113 F.3d 433, 442-43 (3d Cir. 1997), abrogated on other grounds by Metro. Life Ins. Co. v. Glenn , 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008) ).

AR 1209-1210.

AR 136.

AR 12. The Court interprets this language to mean that a claimant's inability to perform even a single material duty of his or her "Regular Occupation" satisfies the "Total Disability" requirement. See Granger v. Life Ins. Co. , No. 614CV1820ORL41DAB, 2016 WL 2851434, at *10 (M.D. Fla. Mar. 28, 2016) (compiling cases in which similar plan language has been so interpreted).

Acree v. Hartford Life & Acc. Ins. Co. , 917 F. Supp. 2d 1296, 1319 (M.D. Ga. 2013) (citations omitted).

Id. (citing Burnett v. AIG Life Ins. Co. , 2011 WL 1226867, at *12 (E.D.Ky. Mar. 30, 2011) ).

AR 126.

AR 363 (recommending empiric trials of minocycline and clarithromycin ); AR 373 (noting patient's reluctance to undergo empiric trials); AR 1033 (same).

See Turner v. Am. Airlines, Inc. , No. 10-80623-CIV, 2011 WL 1542078, at *8 (S.D. Fla. Apr. 21, 2011) ("Over a period of 182 days between February 25, 2007 and August 25, 2007, Mr. Turner did not use CPAP therapy at all on 116 days. Between October 28, 2007 and January 27, 2008, Mr. Turner did not use CPAP therapy at all on 47 out of 91 days. Because he was not using his CPAP therapy, Mr. Turner's treatment had become ineffective and he was unable to work.").

AR 373.

AR 1033.

AR 939.

Cf. Ferguson v. Hartford Life & Acc. Ins. Co. , 268 F. Supp. 2d 463, 471 (E.D. Pa. 2003) (plan administrator's selective reading of its own medical examiner's reports "raises doubt regarding its objectivity").

See Doe v. Aetna Life Ins. Co. , No. 1:17-CV-01167-SCJ, 2018 WL 6380768, at *3 (N.D. Ga. July 23, 2018) (holding that a plan administrator could not "simply cherry-pick 'untimely' evidence that supports its conclusion, while ignoring evidence in an admittedly timely appeal request that does not support its conclusion"); see also Burnett , 2011 WL 1226867, at *12 ("When a plan fiduciary relies on inconclusive, unreliable evidence, and ignores contrary evidence, the resulting decision is arbitrary and capricious.") (citation omitted); Shaw v. AT & T Umbrella Ben. Plan No. 1 , 795 F.3d 538, 548-49 (6th Cir. 2015) (holding that it was wrong and unreasonable for the plan administrator and its physician advisors to ignore the conclusions of a residual-functional-capacity questionnaire submitted on the plaintiff's behalf).

Def.'s Resp. to Pl.'s Mot. for J. on the Admin. Rec., at 9.

Id.

AR 1201. Dr. Whitcomb lists the records that he reviewed in his report but does not mention the Functional Capacity Evaluation.

See Oliver v. Coca Cola Co. , 497 F.3d 1181, 1198 (11th Cir.) (holding that it was arbitrary and capricious to rely on the opinion of a medical examiner who concluded that the claimant could perform "sedentary" work but did not address objective medical evidence to the contrary in the record), reh'g granted, opinion vacated in part on other grounds , 506 F.3d 1316 (11th Cir. 2007), and adhered to in part on reh'g sub nom. Oliver v. Coca-Cola Co. , 546 F.3d 1353 (11th Cir. 2008) ; Shaw , 795 F.3d at 549 ("Instead of offering evidence to contradict Dr. Reincke's residual-functional-capacity questionnaire's conclusions, the Plan's physician advisors simply ignored the questionnaire and concluded that Shaw could perform sedentary work. '[A] plan may not reject summarily the opinions of a treating physician, but must instead give reasons for adopting an alternative opinion.')(quoting Elliott v. Metro. Life Ins. Co. , 473 F.3d 613, 620 (6th Cir. 2006) ).

The Defendant suggests at various points in its briefing that denial of the Plaintiff's claims might have been justified because some evidence in the record suggests that the Plaintiff's symptoms are caused by underlying psychological issues. Cf. Def.'s Br. in Supp. of Mot. for Summ. J., at 14-15 [Doc. 29-2]; Def.s' Resp. to Pl.'s Mot. for J. on the Admin. Rec., at 14-15. The Defendant's argument finds some support in the records of Drs. Rye and Zolty, who suggested that the Plaintiff's condition could be attributed in part to underlying anxiety. AR 443, 1032-33. The Court need not address this alternative justification because it was not mentioned in either of the Defendant's denial letters below. See Harris v. Aetna Life Ins. Co. , 379 F. Supp. 2d 1366, 1372 (N.D. Ga. 2005) ("[P]ost hoc explanations for benefits denials are generally without merit[.]") (citing Marecek v. BellSouth Telecomms., Inc. , 49 F.3d 702, 706 (11th Cir. 1995) ). In any event, the appropriate inquiry is not into the cause of the Plaintiff's impairment but rather whether the limitations arising from the impairment are supported by the evidence. A claimant's malingering or refusal to pursue treatment for the cause of his impairment could warrant denial of benefits, cf. Turner, 2011 WL 1542078, but in this case it appears that the Plaintiff's anxiety is being treated with various medications. And, as the Defendant concedes, the Plaintiff is not pursuing a benefits claim for anxiety or any other mental disorder. Def.'s Resp. to Pl.'s Mot. for J. on the Admin. Rec., at 14.

First Am. Compl. ¶ 22 [Doc. 3]; Pl.'s Mot. for J. on the Admin. Rec., at 29 [Doc. 28-1].

Levinson , 245 F.3d at 1330 (citing Jett , 890 F.2d at 1140 ).

While this Court has concluded that the Defendant arbitrarily ignored the results of the Plaintiff's Functional Capacity Evaluation, the Functional Capacity Evaluation was before the Defendant at the time that it denied the Plaintiff's appeal. See AR 134 (acknowledging receipt of the Functional Capacity Evaluation).

459 F.3d 1088, 1097 (11th Cir. 2006) (quoting Cook v. Liberty Life Assurance Co., 320 F.3d 11, 24-25 (1st Cir.2003) ).

See Billings , 459 F.3d at 1097 (affirming award of benefits through the date of entry of judgment in similar circumstances).

The Court offers no opinion on whether the Plaintiff is disabled under the "Any Occupation" standard that applies after 36 months. That determination is left to the discretion of the plan administrator.

See Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Alabama , 41 F.3d 1476, 1484 (11th Cir. 1995) ("The award of an amount of prejudgment interest in an ERISA case is a matter 'committed to the sound discretion of the trial court.' ") (quoting Moon v. American Home Assurance Co. , 888 F.2d 86, 89-90 (11th Cir.1989) ); Evans v. Bexley , 750 F.2d 1498, 1500 (11th Cir. 1985) ("A district court may in his discretion award a reasonable attorney's fee and costs of the action to either party in an ERISA action.") (citing 29 U.S.C. § 1132(g)(1) ).